UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Pulling Guard Productions, LLC d/b/a
The Arena League,

Case No. 0:26-cv-2305

Plaintiff,

vs.

Jacob Lambert; J&B Manufactured
Home Services LLC; Steve Walters;
Minnesota Monsters Entertainment
LLC; Kramer Service Group, LLC;
Brent LaBrie; Arena Football 1, LLC;
and DOES 1–10,

Defendant.

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Pulling Guard Productions, LLC d/b/a The Arena League, for its Complaint

against the above-named Defendants, states and alleges as follows:

**NATURE OF THE ACTION**

1.     This case arises from Defendants' ongoing attempts to seize and exploit the

intellectual property, goodwill, and fan base of a professional arena football team that was

created, developed, and operated within a centralized league owned by Plaintiff Pulling

Guard Productions, LLC d/b/a The Arena League.

2.     Plaintiff built and operated The Arena League, a professional indoor football

league comprised of member teams operating under a unified licensing and governance

structure. One of those member teams was the Duluth Harbor Monsters, which was

licensed to certain Defendants to operate as a team in Plaintiff's league.

1

3.     After purporting to transfer ownership of the Duluth Harbor Monsters, Defendants are now attempting to launch a competing team in a rival league while publicly representing to fans that the new team is the continuation of the Duluth Harbor Monsters. These representations are false and misleading. They were made without Plaintiff's approval and while the team remained bound by a Team Participation Agreement that governs participation in The Arena League and the use of Plaintiff's intellectual property.

4.     Defendants' conduct violates federal trademark law, constitutes false designation of origin and unfair competition, breaches binding contractual obligations, interferes with Plaintiff's venue and business relationships, and is causing immediate and irreparable harm.

### PARTIES

5.     Plaintiff Pulling Guard Productions, LLC dba The Arena League ("Plaintiff" or "the League") is an Iowa limited liability company with a registered address at 1500 David Street, Waterloo, Iowa 50703. The League's sole member is Jeff Holmes, who is a citizen of Iowa. The League owns, operates, and administers a professional indoor arena football league called The Arena League ("TAL"), which includes the Duluth Harbor Monsters as a member team.

6.     Defendant Jacob Lambert ("Lambert") is an individual who has publicly held himself out as a new owner of the Duluth Harbor Monsters team and who is actively involved in launching a competing team called the Minnesota Monsters in the Arena Football 1 league.

7.      J&B Manufactured Home Services LLC ("J&B") is a Minnesota limited liability company with a registered office address at 18202 Minnetonka Blvd., Wayzata, MN 55391. Lambert is the owner and manager of J&B. J&B has publicly held itself out as a new owner of the Duluth Harbor Monsters team and is actively involved in launching a competing team called the Minnesota Monsters in the Arena Football 1 league.

8.      Defendant Steve Walters ("Walters") is an individual who has publicly held himself out as a new owner of the Duluth Harbor Monsters team and who was actively involved in launching a competing team called the Minnesota Monsters in the Arena Football 1 league.

9.      Defendant Minnesota Monsters Entertainment LLC ("Minnesota Monsters Entertainment") is a Minnesota limited liability company with a registered office address at 18202 Minnetonka Blvd., Deephaven, MN 55391. Walters is the registered manager of Minnesota Monsters Entertainment. Upon information and belief, Lambert, J&B, and Walters formed Minnesota Monsters Entertainment to operate their competing team in the Arena Football 1 league.

10.      Defendant Kramer Service Group, LLC ("KSG") is a Wisconsin limited liability company with a principal office located at W14405 Highway 8 Weyerhaeuser, WI 54895. KSG executed a Team Participation Agreement with the League to become the licensed operator of the Duluth Harbor Monsters.

11.      Defendant Brent LaBrie is the principal of KSG and was the original owner and operator of the Duluth Harbor Monsters.

12.     Defendant Arena Football 1, LLC ("AF1") is a Wyoming limited liability company with a principal office located at 425 S. Gillette Avenue, Gillette, WY 82716. AF1 owns and operates an indoor football league that competes with TAL, and it has publicly announced the addition of the Minnesota Monsters as a new franchise.

13.     Upon information and belief, DOES 1–10 participated in and are liable for the conduct alleged herein

## JURISDICTION AND VENUE

14.     This Court has federal question jurisdiction under 28 U.S.C. § 1331 and 15 U.S.C. § 1121 because this action arises under the Lanham Act, 15 U.S.C. §1125(a).

15.     This Court has supplemental jurisdiction over related state law claims under 28 U.S.C. § 1367(a).

16.     Venue in this district is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims in this action occurred in this district.

## FACTUAL BACKGROUND

**I.      The Arena League's Centralized Model**

17.     TAL is a professional indoor arena football league with teams located throughout the United States.

18.     TAL was founded by The Arena League, LLC in 2023. Plaintiff subsequently acquired TAL from The Arena League, LLC in September 2024.

19.     TAL was formed to build a sustainable, centrally coordinated league structure in which the League—not individual team operators—controls the core

intellectual property, competitive framework, and commercial infrastructure necessary for professional indoor football operations.

20.     The League organizes TAL competition, sets schedules, establishes league-wide rules of play, negotiates vendor relationships, maintains statistical records, oversees officiating, and protects the integrity of league competition. The League invests substantial capital and operational resources into building each member team's brand identity, fan base, and commercial viability.

21.     Unlike a loosely affiliated association of independent teams, TAL operates under a centralized licensing model. Under this model, the League develops and controls team names, logos, branding elements, and associated intellectual property and licenses those rights to local operators subject to strict compliance obligations. The League maintains authority over ownership transfers and competitive affiliation, coordinates league-wide sponsorships and vendor contracts, manages merchandising and ticketing infrastructure, and retains the right to revoke or reassign team licenses upon breach.

22.     This structure ensures brand consistency, protects fan goodwill, and allows the League to build a unified professional product across multiple markets.

## II.     The Fragmented Arena Football Industry and Need for League Stability

23.     Indoor arena football has historically been highly fragmented and unstable. Numerous leagues have formed and dissolved while competing for the same markets, venues, sponsors, and fan bases. A recurring industry problem has been teams leaving leagues and attempting to relaunch in competing leagues while presenting themselves as the same franchise.

24.     This pattern has repeatedly resulted in consumer confusion, disruption of venue agreements, loss of sponsorship relationships, erosion of fan trust, and financial instability across leagues. TAL's centralized licensing model was designed specifically to prevent the unauthorized diversion of League-developed goodwill to other leagues that compete with TAL.

25.     TAL's economic model depends heavily on centralized brand control and league continuity. The value of any given team derives not merely from local ownership, but from its membership in TAL, participation in League-sanctioned competition, and association with League-controlled intellectual property and historical records.

26.     Professional sports leagues require centralized approval of team ownership and league affiliation to maintain competitive integrity and protect league-wide commercial interests. TAL's agreements with member team operators reflect these principles and require League approval before any ownership transfer or league affiliation change may occur.

27.     Without these protections, team operators could build a fan base using League resources and then transfer that goodwill to a competing league without compensation or approval, undermining TAL's business model and harming its remaining member teams.

## III.     The League's Investment in the Duluth Harbor Monsters

28.     Within this centralized system, the League developed and funded the branding and marketing of the Duluth Harbor Monsters, a TAL team based in Duluth, Minnesota. The League coordinated league-wide marketing, maintained the team's official

statistics and historical records, and integrated the team into the League's merchandising, vendor, and promotional infrastructure.

29. The Duluth Harbor Monsters brand—including its name, logos, historical records, and fan goodwill—was developed within TAL's centralized model and is the intellectual property of the League.

30. Consistent with TAL's centralized model, the League licenses the Duluth Harbor Monsters brand to a team operator, which then operates a team that plays in TAL competition as the Duluth Harbor Monsters.

## IV. The Team Participation Agreement

31. On or about May 30, 2023, KSG, through LaBrie, entered into a Team Participation Agreement ("TPA") with The Arena League, LLC to operate the Duluth Harbor Monsters as a TAL member team. The TPA was assigned to the League when the League acquired TAL from The Arena League, LLC in September 2024.

32. The TPA governs the rights and obligations of both the League and KSG and reflects TAL's centralized model of league governance.

33. The TPA establishes that the Duluth Harbor Monsters team operates as a League licensee, with the League granting a license to KSG to use the team intellectual property.

34. The TPA makes clear that all TAL team names, logos, and branding are the intellectual property of the League and are licensed for use only in connection with participation in TAL. The League retains full control over team names and branding.

35.     Among other provisions, the TPA provides that the team agrees to participate in TAL in perpetuity so long as the team satisfies the League's minimum base requirements, including payment of annual dues and compliance with league-wide vendor agreements.

36.     Failure to field a team in the League constitutes a material breach of the TPA and establishes liquidated damages in the amount of $150,000 in the event of such breach.

37.     The TPA further provides that in the event of a breach, the League may revoke the team's license, assume control of team operations, and reassign the team rights.

38.     KSG can assign its rights under the TPA only with the express written consent of the League.

39.     These provisions are fundamental to TAL's business model and are essential to preserving TAL's stability and preventing the diversion of League-developed goodwill to competing football leagues.

40.     At all relevant times, KSG remained bound by the TPA.

## V.     The League's Right to Commission on Ticket Sales and Corporate Sponsorships

41.     As part of their participation in TAL, the Duluth Harbor Monsters team, like all member teams, is required to pay the League a 5 percent commission on the team's ticket sales and corporate partnership sales each season.

42.     KSG paid the required 5 percent commission to the League for ticket sales and corporate sponsorships from the 2024 season.

8

43.    On October 30, 2025, LaBrie, on behalf of KSG, informed TAL that KSG refused to pay the required 5 percent commission to the League for ticket sales and corporate sponsorships from the 2025 season, which amounts to more than $12,000.

## VI.    The Facility Use Agreement

44.    On or about March 26, 2023, The League separately entered into a multi-season Facility Use Agreement ("FUA") with the Duluth Entertainment Convention Center ("DECC") for use of the DECC Arena as the home venue of the Duluth Harbor Monsters.

45.    The FUA is a central component of TAL's operations in the Duluth market. Under that agreement, the League secured home game dates for multiple seasons extending through August 31, 2026. The FUA provides the League with scheduling priority, operational access to the arena, and the ability to coordinate ticketing, sponsorship activation, vendor services, and game-day operations consistent with TAL standards.

46.    The FUA identifies The League—not the local team operator—as the contracting party and tenant. This structure reflects TAL's centralized league model, under which venue relationships are negotiated and maintained at the league level—rather than team level—to ensure consistency, stability, and commercial reliability across all member teams.

47.    The League's ability to secure and maintain stable arena relationships is essential to scheduling, sponsorship commitments, ticket sales, and the overall integrity of TAL competition.

48.     Under the FUA, the League is responsible for paying use fees and additional fees to DECC. However, ultimate responsibility for paying arena rent and expenses rests with the Duluth Harbor Monsters team.

## VII.   The Unauthorized Ownership Announcement and League Defection

49.     In July 2025, LaBrie notified the League that KSG intended to sell the Duluth Harbor Monsters to Lambert.

50.     The League informed LaBrie, KSG, and Lambert that League approval and a formal application process were required before any transfer could occur.

51.     The League never approved a sale of the Duluth Harbor Monsters, granted authorization for any ownership transfer or change in control, or executed a release from the team's TAL participation obligations.

52.     Nevertheless, on September 12, 2025, Lambert and J&B publicly announced themselves as the new owners of the Duluth Harbor Monsters.

53.     That same day, LaBrie sent a text message to Jeff Holmes, the League's owner, acknowledging that the announcement had been made without the League's approval and before the underlying transaction had been completed. In the text message, LaBrie wrote, "I knew nothing of this. This was not part of our agreement either. I reached out to both of these guys asking wtf. As in we still have not been given league approval."

54.     LaBrie further confirmed that Lambert and Walters had not yet fully paid for the team and that the announcement was premature and inconsistent with the status of the transaction, stating, "Im not paid until March to me this is not the look we wanted. Im assuming steve and Jacob wanted to make waves now."

10

55.     Shortly thereafter, media reports indicated that the Duluth Harbor Monsters team would leave TAL and join the competing AF1 league.

56.     The League never received notice from any Defendant that the Duluth Harbor Monsters would not participate in the 2026 TAL season.

57.     The League publicly stated that it had not approved any ownership change or league transfer.

58.     AF1 subsequently announced the "Minnesota Monsters" as a new team in the AF1 league.

59.     Upon information and belief, Lambert, J&B, and Walters formed Minnesota Monsters Entertainment to operate the Minnesota Monsters in the AF1 league.

## VIII.  Defendants' Social Media Campaign Promoting Continuity

60.     On September 25, 2025, Defendants launched a coordinated public campaign to reassure fans that the Duluth Harbor Monsters team would continue uninterrupted under the AF1 league banner as the Minnesota Monsters.

61.     Using a Duluth Harbor Monsters social media account, Defendants published social media posts and graphics stating that the team would remain the "same team," in the "same place," serving the "same community." Defendants' posts directed fans to "www.minnesotamonsters.com."

62.     Defendants' representations were designed to assure fans, sponsors, vendors, and venue partners that the team was simply continuing under a new league and that nothing material with respect to the team had changed.

11

63. These representations were false and misleading. Defendants did not possess the League's authorization to transfer or continue the Duluth Harbor Monster team's intellectual property, history, or goodwill.

64. Though Defendants have ostensibly changed the team's name, the Minnesota Monsters branding is significantly similar to that of the Duluth Harbor Monsters:



65. By promoting continuity while simultaneously affiliating with a competing league, Defendants have created and will continue to create a substantial likelihood of consumer confusion regarding affiliation, sponsorship, and approval.

## IX. Defendants' Interference with the FUA

66. Defendants initially announced that the Minnesota Monsters, *i.e.*, the "same team" as the Duluth Harbor Monsters, would continue playing at the DECC Arena while affiliating with the AF1 league.

67.     Defendants subsequently announced that the Minnesota Monsters would play at AMSOIL Arena, which is also owned by DECC and is located next to the DECC Arena.

68.     Defendants' representation that the Minnesota Monsters will continue to play in Duluth at a venue next to the DECC Arena interferes with the League's ability to perform its obligations under the FUA.

69.     Furthermore, Defendants' representation threatens to disrupt League scheduling and operations, cause venue confusion, and damage the League's credibility with arena operators, sponsors, and vendors across TAL.

## X.      The League's Efforts to Resolve the Dispute

70.     After learning of Defendants' conduct, the League notified Defendants of the League's contractual rights and sought to reach a resolution that would compensate the League for the unauthorized use of its intellectual property and address the contractual breaches.

71.     Defendants rejected the League's demands and denied wrongdoing.

72.     AF1, Lambert, J&B, Walters, and Minnesota Monsters Entertainment have continued to promote the Minnesota Monsters' affiliation with the AF1 league and falsely represent the team as a continuation of the Duluth Harbor Monsters, while using the League's intellectual property.

73.     According to their schedule, the Minnesota Monsters played their first game in the AF1 league on April 11, 2026, and their first home game in Duluth is scheduled on May 22, 2026.

13

74.     TAL's 2026 season begins May 29, 2026, with preseason games beginning May 22, 2026.

## COUNT I - FALSE ADVERTISING AND FALSE DESIGNATION OF ORIGIN
### (Lanham Act, Section 43(a))
### (Against Lambert, J&B, Walters, Minnesota Monsters Entertainment, and AF1)

75.     The League realleges each of the preceding allegations, as if fully set forth herein.

76.     The League owns, controls, and licenses the intellectual property associated with the Duluth Harbor Monsters, including the team name, branding, logo, and goodwill developed within the League's centralized system.

77.     Defendants have used and continue to use in commerce branding, marketing language, and representations that falsely suggest that the Minnesota Monsters are the continuation of the Duluth Harbor Monsters team.

78.     Defendants have publicly represented, including in commercial advertising and promoting, that the Minnesota Monsters are the "same team," in the "same place," serving the "same community" as the Duluth Harbor Monsters, while simultaneously announcing affiliation with a competing league.

79.     These representations are false and misleading because Defendants have not received League approval, have not obtained a lawful transfer of the license, and are not authorized to use League-controlled intellectual property outside League participation.

80.     These representations further misstate the origin, affiliation, and sponsorship of Defendants' services.

14

81.     Defendants' actions were undertaken knowingly and willfully with the intent to capitalize on the League's goodwill.

82.     Defendants' conduct is likely to cause, and has caused, consumer confusion as to the affiliation, sponsorship, approval, and continuity of the team.

83.     Defendants' statements are likely to deceive, and have deceived, a substantial segment of the League's customers and potential customers.

84.     Defendants' deception is material because it is likely to influence consumers' purchasing decisions, including ticket purchases and sponsorship decisions.

85.     Defendants' statements were made in interstate commerce.

86.     Defendants' statements have injured and are likely to continue injuring the League.

87.     As a result of Defendants' conduct, the League has incurred and will incur damages.

## COUNT II - UNREGISTERED TRADEMARK INFRINGEMENT
### (Lanham Act, Section 43(a))
### (Against Lambert, J&B, Walters, Minnesota Monsters Entertainment, and AF1)

88.     The League realleges each of the preceding allegations, as if fully set forth herein.

89.     The League has an interest in the Duluth Harbor Monsters name, branding, and logo, which is the League's valid trademark. This mark is distinctive, and the League uses its mark in interstate commerce.

90.     The League has used the mark publicly and continuously since before Defendants commenced use of the Duluth Harbor Monsters team branding.

15

91. Defendants' use of the mark is likely to cause consumer confusion.

92. As a result of Defendants' conduct, the League has incurred and will incur damages.

## COUNT III - BREACH OF CONTRACT
### (Against Kramer Service Group, LLC)

93. The League realleges each of the preceding allegations, as if fully set forth herein.

94. The Team Participation Agreement ("TPA") is a valid and enforceable contract.

95. The League has performed its obligations under the TPA.

96. KSG has breached the TPA by, among other things:

    a. Attempting to transfer and/or transferring ownership of the Duluth Harbor Monsters without the League's approval;

    b. Attempting to affiliate the Duluth Harbor Monsters with a competing league;

    c. Using the League's licensed intellectual property outside the scope of the license;

    d. Failing to comply with participation obligations.

97. These breaches constitute material breaches of the TPA. The TPA provides for liquidated damages in the amount of $150,000 upon KSG's failure to field a team in the League.

98. KSG further breached its contractual obligations to the League by refusing to pay the required 5 percent commission on ticket sales and corporate sponsorships from the 2025 season.

99. As a result of KSG's breaches, the League has incurred and will incur damages, including liquidated damages, loss of goodwill, and additional consequential damages.

## COUNT IV - TORTIOUS INTERFERENCE WITH CONTRACT
### (Against LaBrie, Lambert, J&B, Walters, Minnesota Monsters Entertainment, and AF1)

100. The League realleges each of the preceding allegations, as if fully set forth herein.

101. The TPA and the FUA are valid and enforceable contracts.

102. Upon information and belief, LaBrie, Lambert, Walters, Minnesota Monsters Entertainment, and AF1 had knowledge of these agreements.

103. LaBrie, Lambert, Walters, Minnesota Monsters Entertainment, and AF1 intentionally induced or caused breaches of the TPA by encouraging and facilitating the unauthorized ownership transfer of the Duluth Harbor Monsters team and by causing the Duluth Harbor Monsters team to join the AF1 league.

104. LaBrie, Lambert, Walters, Minnesota Monsters Entertainment, and AF1 intentionally induced or caused breaches of the FUA by purportedly transferring ownership of the Duluth Harbor Monsters, which was contracted to play at the DECC Arena, and contracting for the Minnesota Monsters, which they claim is the same team as the Duluth

17

Harbor Monsters, to play at AMSOIL Arena, thereby leaving the League unable to fulfill its obligations under the FUA.

105.   Their interference with both contracts was intentional and without justification.

106.   As a result of their interference, the League has incurred and will incur damages.

## COUNT V - TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (Against Lambert, J&B, Walters, Minnesota Monsters Entertainment, and AF1)

107.   The League realleges each of the preceding allegations, as if fully set forth herein.

108.   The League has a reasonable expectation of economic advantage stemming from its ownership of the Duluth Harbor Monsters intellectual property and the license of that intellectual property to a team operator. Based on the team's intellectual property, the League has developed fan goodwill using the team's intellectual property, and team operators use the intellectual property to promote ticket sales and obtain corporate sponsorships. Further, the League receives a percentage of the team operator's revenue from ticket sales and corporate sponsorships. The League's expectation of economic advantage depends on the Duluth Harbor Monsters team remaining within the TAL.

109.   Defendants knew of the League's expectation of economic advantage.

110.   Defendants intentionally interfered with the League's expectation of economic advantage by representing continuity and affiliation between the Duluth Harbor Monsters and the Minnesota Monsters, while diverting the team to the competing AF1

18

league. Defendants' conduct has destroyed the Duluth market for the League and deprived the League of its ability to realize any economic advantage from the Duluth Harbor Monsters intellectual property.

111.    Defendants' conduct was independently tortious.

112.    In the absence of Defendants' conduct, it is reasonably probable that the Duluth Harbor Monsters team would remain in the TAL and the League would have realized its economic benefit from the Duluth Harbor Monsters intellectual property.

113.    As a result of Defendants' wrongful conduct, the League has incurred and will incur damages.

## COUNT VI - UNJUST ENRICHMENT
### (Against All Defendants)

114.    The League realleges each of the preceding allegations, as if fully set forth herein.

115.    The League possesses valuable intellectual property, branding rights, and goodwill.

116.    Defendants have knowingly accepted the benefit of the League's valuable intellectual property, branding rights, and goodwill concerning the Duluth Harbor Monsters Team, as they have publicly asserted to fans and others that their competing team, the Minnesota Monsters, is the same team as the Duluth Harbor Monsters, despite moving such team from TAL to the AF1 league without the League's authorization.

117.    Under the circumstances, it would be inequitable for Defendants to retain the League's intellectual property, branding rights, and goodwill without paying for it.

118.   As a result of Defendants' wrongful conduct, the League has incurred and will incur damages.

## COUNT VII - MINNESOTA DECEPTIVE TRADE PRACTICES ACT
### (Minn. Stat. § 325D.44)
### (Against All Defendants)

119.   The League realleges each of the preceding allegations, as if fully set forth herein.

120.   Defendants have violated Minnesota's Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43 et seq., by engaging in prohibited trade practices, including:

    a. Causing a likelihood of confusion or misunderstanding as to the sponsorship or approval of the Duluth Harbor Monsters/Minnesota Monsters team;

    b. Causing a likelihood of confusion or misunderstanding as to the affiliation of the Duluth Harbor Monsters/Minnesota Monsters team;

    c. Representing that the Duluth Harbor Monsters/Minnesota Monsters team has a sponsorship, approval, status, affiliation, or connection that the team does not have; and

    d. Engaging in unfair methods of competition with the League.

121.   The League is entitled to all relief available under the Deceptive Trade Practices Act, including injunctive relief, costs, and attorneys' fees.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for an Order of the Court as follows:

20

1. Issue a Temporary Restraining Order and/or Preliminary Injunction enjoining Defendants from:

    a. Using any TAL-controlled intellectual property;

    b. Representing the Minnesota Monsters' affiliation or continuity with the Duluth Harbor Monsters;

    c. Promoting the Minnesota Monsters as the same franchise as the Duluth Harbor Monsters;

    d. Interfering with TAL's venue agreements;

    e. Fielding the Minnesota Monsters team in Duluth;

2. Enter a Permanent Injunction consistent with the above;

3. Award the League all damages sustained, including actual damages, liquidated damages, consequential damages, and statutory remedies;

4. Award the League its attorney fees, costs, and disbursements as permitted by law; and

5. Grant such other and further relief as the Court deems just and equitable.

**BEST & FLANAGAN LLP**

Dated: April 20, 2026

*/s/ John A. Sullivan*
John A. Sullivan (# 0396730)
Allison L. Dohnalek (# 0403440)
60 South Sixth Street, Suite 2700
Minneapolis, MN 55402
(612) 339-7121
johnsullivan@bestlaw.com
adohnalek@bestlaw.com

***Attorneys for Plaintiff***

22